**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION**

| | |
|---|---|
| REBEKAH SNYDER,<br><br>        Plaintiff,<br><br>    vs.<br><br>ANGIODYNAMICS, INC., & NAVILYST<br>MEDICAL, INC.,<br><br>        Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES**<br><br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

**COMES NOW** Plaintiff, Rebekah Snyder, (hereinafter "Plaintiff"), by and through her undersigned counsel, and brings this Complaint against AngioDynamics, Inc., and Navilyst Medical, Inc., (collectively, the "Defendants"), and alleges as follows:

1.      This is an action for damages arising out of failures relating to Defendants' design, development, testing, assembling, manufacturing, packaging, promoting, marketing, distribution, supplying, and/or selling the defective implantable vascular access device sold under the trade name of Smart Port ("Device" or "Defective Device").

## PARTIES

2. Plaintiff, Rebekah Snyder, is an adult resident of Parker County, Texas and claims damages as set forth below.

3. Defendant AngioDynamics, Inc. ("AngioDynamics") is a Delaware corporation with its principal place of business located in Latham, New York. AngioDynamics is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying,

selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the Device.

4. Defendant Navilyst Medical, Inc. ("Navilyst") is a Delaware corporation with its principal place of business located in Marlborough, Massachusetts. Navilyst conducts business throughout the United States and is a wholly owned subsidiary of AngioDynamics. Navilyst is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the Device.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. §1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and cost.

6. Venue is proper in this Court pursuant to 28 U.S.C. §1391 by virtue of the facts that (a) a substantial part of the events or omissions giving rise to the claims occurred in this District, and (b) Defendants' products are produced, sold to, and consumed by individuals in the State of Texas, thereby subjecting Defendants to personal jurisdiction in this action and making them all "residents" of this judicial District.

7. Defendants have and continue to conduct substantial business in the State of Texas and in this District, distribute vascular access products in this District, receive substantial compensation and profits from sales of vascular access products in this District, and made material omissions and misrepresentations and breaches of warranties in this District, so as to subject them

COMPLAINT

to *in personam* jurisdiction in this District.

8.      Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, this Court has *in personam* jurisdiction over Defendants because Defendants are present in the State of Texas, such that requiring an appearance does not offend traditional notices of fair and substantial justice.

## PRODUCT BACKGROUND

9.      In or about 2013, Defendants received clearance via the 501(k) Premarket Notification Program from the Food and Drug Administration (FDA) to market and sell Device.

10.      Defendants' Vascular Access Devices were designed, patented, manufactured, labeled, marketed, sold, and distributed by the Defendants at all relevant times herein.

11.      The Smart Port is one of several varieties of port/catheter systems that has been designed, manufactured, marketed, and sold by Defendants.

12.      According to Defendants, the Device is a totally implantable vascular access device designed to provide repeated access to the vascular system for the delivery of medication, intravenous fluids, parenteral nutrition solutions, and blood products.

13.      The intended purpose of the Device is to make it easier to deliver medications directly into the patient's bloodstream. The device is surgically placed completely under the skin and left implanted.

14.      The Device is surgically placed under the skin, intended to be left implanted, and consists of two primary components: an injection port and a catheter.

– 3 –

COMPLAINT

15.     The injection port has a raised center, or "septum," where the needle is inserted for delivery of the medication. The medication is carried from the port into the bloodstream through a small, flexible tube, called a catheter, which is inserted into a blood vessel.

16.     The Device is indicated for patient therapies requiring repeated access to the vascular system. The port system can be used for infusion of medications, I.V. fluids, parenteral nutrition solutions, blood products, and for the withdrawal of blood samples.

17.     The Device's catheter is a polymeric mixture of silicone or polyurethane and barium sulfate, a radiopaque compound that is visible in certain radiologic studies.

18.     Barium sulfate is known to contribute to reduction of the mechanical integrity of polymers *in vivo* as the particles of barium sulfate dissociate from the surface of the catheter over time, leaving microfractures and other alterations of the polymeric structure and degrading the mechanical properties of the polyurethane.

19.     Researchers have shown that catheter surface degradation in products featuring a radiopaque barium sulfate stripe is concentrated at the locus of the stripe.[1]

20.     The mechanical integrity of a barium sulfate-impregnated polymer is affected by the concentration of barium sulfate as well as the heterogeneity of the modified polymer.

21.     Cracks, fissures, divots, and/or pitting on the surface of the catheter can cause thrombosis by permitting the collection and proliferation of fibrinous material present in the bloodstream.

---

[1] See Hecker JF, Scandrett LA. Roughness and thrombogenicity of the outer surfaces of intravascular catheters. *J Biomed Mater Res*. 1985;19(4):381-395. doi:10.1002/jbm.820190404

COMPLAINT

22.     Indeed, "roughness of the catheter surface … promotes thrombogenicity."[2]

23.     "Surface irregularities resulting from the release of [barium sulfate] may represent a common causative pathway for these complications" and many others.[3]

24.     Upon information and belief, Defendants' manufacturing process in designing and constructing the catheter implanted in Plaintiff involved too high a concentration of barium sulfate particles for the polymer formulation, leading to improperly high viscosity of the admixed polymer before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix.

25.     This defect in the manufacturing process led to a heterogeneous modified polymer which included higher barium sulfate concentration and led to increased barium sulfate dissociation which caused increased surface irregularities.

26.     Although the surface degradation and resultant mechanical failure can be reduced or avoided with design modifications (e.g., using a higher grade radiopacity compound and/or encapsulating the admixed polymer within polyurethane), Defendants elected not to incorporate those design elements into the Device.

27.     At all relevant times, Defendants could have designed the catheter of the Device with radiopaque materials other than barium sulfate.

28.     At all relevant times, Defendants could have sheathed the catheter of the Device.

29.     At all relevant times, Defendants could have coated the catheter of the Device with a surface-modifying additive and/or functional coating.

---

[2] Verbeke et al., *The role of polymer surface degradation and barium sulphate release in the pathogenesis of catheter-related infection*, Nephrol. Dial. Transpl. 25 (2010) 1207-1213.
[3] *Id.*

– 5 –

COMPLAINT

30. Because the Device's catheter is not sheathed or otherwise properly coated, the barium sulfate on the catheter's surface contacts the patient's bloodstream.

31. At all relevant times, Defendants could have reinforced the catheter to prevent "pinch off", kinking, and/or fracture.

32. Because the Device's catheter is not sheathed or otherwise properly coated, the barium sulfate on the catheter's surface contacts the patient's bloodstream.

33. At all times relevant, Defendants misrepresented the safety of the Device, and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold the Device system as safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of medications, intravenous fluids, parenteral nutrition solutions, and blood products.

34. Defendants obtained "clearance" to market these products under Section 510(k) of the Medical Device Amendments to the Food, Drug, and Cosmetic Act.

35. Section 510(k) permits the marketing of medical devices if the device is substantially equivalent to other legally marketed predicate devices without formal review for the safety or efficacy of the device. The FDA explained the difference between the 510(k) process and the more rigorous "premarket approval" ("PMA") process in its amicus brief filed with the Third Circuit in *Horn v. Thoratec Corp.*, which the court quoted from:

> A manufacturer can obtain an FDA findings of 'substantial equivalence' by submitting a premarket notification to the agency in accordance with section 510(k) of the [Food Drug and Cosmetic Act.] 21 U.S.C. § 360(k). A device found to be 'substantially equivalent' to a predicate device is said to be 'cleared' by the FDA (as opposed to "approved' by the agency under a PMA.[4]

---

[4] *Horn v. Thoratec Corp.*, 376 F.3d 163, 167 (3d Cir. 2004) (quoting FDA amicus brief).

COMPLAINT

36.     A pre-market notification submitted under 510(k) is thus entirely different from a PMA, which must include data sufficient to demonstrate that the product involved is safe and effective.

37.     In *Medtronic, Inc.* v. Lohr, the U.S. Supreme Court similarly described the 510(k) process, observing:

> If the FDA concludes on the basis of the [manufacturer's] § 510(k) notification that the device is 'substantially equivalent' to a pre-existing device, it can be marketed without further regulatory analysis…. The § 510(k) notification process is by no means comparable to the PMA process; in contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in average of 20 hours …. As one commentator noted: "The attraction of substantial equivalence to manufacturers is clear. Section 510(k) notification requires little information, rarely elicits a negative response form the FDA, and gets processed quickly.[5]

38.     Pursuant to *Wyeth v. Levine*, 555 U.S. 555 (2009), once a product is cleared "the manufacturer remains under an obligation to investigate and report any adverse associated with the drug…and must periodically submit any new information that may affect the FDA's previous conclusions about the safety, effectiveness, or labeling …." This obligation extends to post-market monitoring of adverse events/complaints.

39.     At all times relevant to this action, Defendants misrepresented the safety of the Device system, and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold the Device system as safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of

---

[5] *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 478-79 (1996) (quoting Adler, the 1976 Medical Device Amendments: A Step in the Right Direction Needs Another Step in the Right Direction, 43 Food Drug Cosm. L.J. 511, 516 (1988)).

medications, intravenous fluids, parenteral nutrition solutions, and blood products.

40.     At all times relevant to this action, Defendants knew and had reason to know, that the Device was not safe for the patients for whom they were prescribed and implanted, because once implanted the device was prone to catheter fracture, infection, thrombosis, and otherwise malfunctioning.

41.     At all times relevant to this action, Defendants knew and had reason to know that patients implanted with a Device port had an increased risk of suffering life threatening injuries, including but not limited to: thrombosis; thromboembolic events; death; infection; fracture; hemorrhage; cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart); cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels and organs, or the need for additional surgeries to remove the defective device.

42.     Soon after the Device was introduced to market, which was years before Plaintiff was implanted with her device, Defendants began receiving large numbers of adverse event reports ("AERs") from health care providers reporting that the Device was fracturing post-implantation and that fractured pieces were migrating throughout the human body, including to the heart and lungs. Defendants also received large numbers of AERs reporting that the Device was found to have perforated internal vasculature. These failures were often associated with reports of severe patient injuries such as:

      a.  hemorrhage;

      b.  thromboembolic events;

      c.  cardiac/pericardial tamponade;

COMPLAINT

d.  cardiac arrhythmia and other symptoms similar to myocardial infarction;

e.  severe and persistent pain;

f.  perforations of tissue, vessels, and organs; and

g.  upon information and belief, even death.

43.    In addition to the large number of AERs which were known to Defendants and reflected in publicly accessible databases, there are many recorded device failures and/or injuries related to the Defendants' implantable port products which were concealed from medical professionals and patients through submission to the FDA's controversial Alternative Summary Reporting ("ASR") program.

44.    The FDA halted the ASR program after its existence was exposed by a multi-part investigative piece, prompting a widespread outcry from medical professionals and patient advocacy groups.[6]

45.    Prior to the discontinuation of the ASR program, Defendants reported numerous episodes of failures of their implanted port/catheter products—including episodes of catheter fracture and leakage, blood clot formation post-implantation, and infection—under the ASR exemption, thereby concealing them from physicians and patients.

46.    Defendants were aware or should have been aware that the Device had a substantially higher failure rate than other similar products on the market, yet Defendants failed to warn consumers of this fact.

47.    Defendants also intentionally concealed the severity of complications caused by the

---

[6] Christina Jewett, *Hidden Harm: Hidden FDA Reports Detail Harm Caused by Scores of Medical Devices*, Kaiser Health News (Mar. 2019)

Device and the likelihood of these events occurring. This included, but was not limited to, knowledge that a fracture of the Device could lead to leakage of chemotherapy medicine which can cause infection and necrosis of the surrounding tissue in the area of the Device port, and that the Device can cause blood clots, including pulmonary embolisms which can be deadly.

48.    Rather than alter the design of the Device to make it safer or adequately warn physicians of the dangers associated with the Device, Defendants continued to actively and aggressively market the Device as safe, despite their knowledge of numerous reports of catheter fracture and associated injuries.

49.    Multiple feasible alternative designs for the Device have been available to Defendants at all times relevant to this matter.

50.    Moreover, Defendants' warnings suggested that fracture of the device could only occur if the physician incorrectly placed the device such that undue catheter compression or "pinch-off" was allowed to occur. In reality, Defendants knew internally these devices were fracturing and causing serious injuries due to defects in the design, manufacturing and lack of adequate warnings.

51.    The conduct of Defendants, as alleged in this Complaint, constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Plaintiff and evidences malice, fraud, gross negligence, and oppressiveness. Defendants had actual knowledge of the dangers presented by the Device System, yet consciously failed to act reasonably to:

      a.  Adequately inform or warn Plaintiff, her prescribing physicians, or the public at large of these dangers;

      b.  Establish and maintain an adequate quality and post-market surveillance system; or

– 10 –

COMPLAINT

c.  Recall the Device System from the market.

**SPECIFIC FACTUAL ALLEGATIONS AS TO PLAINTIFF**

52.  On or about 08/31/2022, a SmartPort CT-Injectable Port was surgically implanted into Plaintiff, reference number H787CT80STPDVI1, lot number 5737567.

53.  The Device was implanted by Annette Marie Elbert, MD at Texas Health Harris Methodist Hospital in Fort Worth, Texas for the purpose of chemotherapy administration to treat Plaintiff's follicular lymphoma.

54.  Defendants, directly or through their agents, apparent agents, servants, or employees designed, manufactured, marketed, advertised, distributed, and sold the Device that was implanted in Plaintiff.

55.  The Device was correctly and properly installed by Dr. Elbert, in accordance with the manufacturer's instructions.

56.  The Device was not implanted in such a manner that would have caused it to compress, kink, erode, or "pinch off."

57.  At all times relevant, the Device was used for its intended purpose of repeated access to the vascular system for the delivery of medication, intravenous fluids, parenteral nutrition solutions, blood products, and for the withdrawal of blood samples.

58.  At all times relevant, Plaintiff's healthcare providers did not place, maintain, or use the Device incorrectly or use the Device for an unforeseeable purpose.

59.  On or about November 4, 2022, the Device began leaking medication into Plaintiff's subcutaneous tissue while Plaintiff was undergoing chemotherapy treatment.

60.  On or about November 7, 2022, Dr. Elbert surgically removed the Device from

COMPLAINT

Plaintiff. Dr. Elbert notes in the removal operative report that the Device's catheter had a "longitudinal split" and that a "[m]manufacturing defect is suspected, as this sort of catheter disruption is not possible externally from access."

61.     Defendants, directly or through their agents, apparent agents, servants, or employees designed, manufactured, marketed, advertised, distributed, and sold the Device that was implanted in Plaintiff.

62.     Defendants manufactured, sold, and/or distributed the Device to Plaintiff, through Plaintiff's medical providers, to be used for the purpose of medication delivery.

63.     At all times, the Device was utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the instructions for use and created procedures for implanting the product.

64.     The Device implanted in Plaintiff was in the same or substantially similar condition as when it left the possession of Defendants and in the condition directed by and expected by Defendants.

65.     Plaintiff and Plaintiff's physicians foreseeably used and implanted the Device and did not misuse or alter the Device in an unforeseeable manner.

66.     Defendants advertised, promoted, marketed, sold, and distributed the Device as a safe medical device when Defendant knew or should have known the Device was not safe for its intended purposes and that the product could cause serious medical problems.

67.     Defendants had sole access to material facts concerning the defective nature of the Device product and its propensity to cause serious and dangerous side effects.

COMPLAINT

68.    In reliance on Defendants' representations, Plaintiff's doctors were induced to, and did use the Device.

69.    As a result of having the Device implanted, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, permanent and substantial physical deformity, has undergone corrective surgeries, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and present and future lost wages.

70.    Defendants' Device was marketed to the medical community and to patients as a safe, effective, reliable, medical devices implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, and as safer and more effective as compared to the traditional products and procedures for treatment and other competing Vascular Access Devices.

71.    The Defendants have marketed and sold the Defendants' Device to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, direct to consumer advertising, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and/or group purchasing organizations, and include a provision of valuable consideration and benefits to the aforementioned.

72.    The injuries, conditions, and complications suffered due to Defendants' Device include, but are not limited to, fracture and leakage; necrosis; infection; blood clots; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; perforations of tissue, vessels and organs; and even death.

– 13 –

COMPLAINT

73.    Defendants were negligent toward Plaintiff in the following respects:

   a.   Defendant failed to design and establish a safe, effective procedure for removal of Device; therefore, in the event of a failure, injury, or complications it is difficult to safely remove Device.

   b.   Defendants provided incomplete, insufficient, and misleading information to physicians in order to increase the number of physicians using Device for the purpose of increasing their sales.   By so doing, Defendants caused the dissemination of inadequate and misleading information to patients, including the Plaintiff.

74.    The Device was utilized and implanted in a manner foreseeable to Defendants.

75.    The Device implanted into Plaintiff was in the same or substantially similar condition as when it left the possession of the Defendants and in the condition directed by the Defendants.

76.    At the time of the operation, Plaintiff was not informed of, and had no knowledge of the complaints, known complications, and risks associated with Device, including, but not limited to the Device's dangerous propensity to (a) fracture and/or dislodge and cause foreign materials to be introduced into the Plaintiff's bloodstream; and (b) precipitate thromboembolism and/or infection.

77.    Plaintiff was never informed by Defendants of the defective and dangerous nature of Device.

78.    At the time of her implant, neither Plaintiff nor Plaintiff's physicians were aware of the defective and dangerous condition of the Device.

79.    Plaintiff has suffered and will continue to suffer physical pain and mental anguish.

80.    Plaintiff has also incurred substantial medical bills and has suffered loss of other monies due to the defective product that was implanted in her body.

## CAUSES OF ACTION

### COUNT I: DESIGN DEFECT – STRICT LIABILITY

81.    Plaintiff restates the allegations above as if fully rewritten herein.

82.    Plaintiff restates the allegations in Count II as if fully rewritten herein.

83.    At all relevant times, Defendants developed, designed, tested, manufactured, packaged, labeled, marketed, advertised, distributed, sold, and otherwise placed the Device into the stream of commerce for use by consumers, such as Plaintiff, in the United States (including commerce in the State of this jurisdiction).

84.    Plaintiff was a foreseeable user of the Device.

85.    The Device was expected to and did reach Defendants' intended consumers, handlers, and persons coming into contact with the product without substantial change in the condition in which they were developed, designed, tested, manufactured, packaged, labeled, marketed, advertised, distributed, and sold by Defendants.

86.    At all relevant times, the Device contained a defective and unreasonably dangerous condition because it is defective in design and is dangerous for use by the public in general and Plaintiff in particular.

87.    These design defects include but are not limited to the use of barium sulfate in the catheter; the absence of sheathing or coating surrounding the catheter; the absence of feasible and cost-effective technology that prevents fractures; and a design that could not withstand repeated, long-term use as advertised.

88.    These design defects existed even if Defendants exercised reasonable care.

89.    The Device, as developed, designed, tested, manufactured, packaged, labeled, marketed, advertised, distributed, and sold by Defendants, is defective in design and formulation

– 15 –

and unreasonably dangerous because the foreseeable risks exceeded the alleged benefits associated with their use.

90.     The Device, as developed, designed, tested, manufactured, packaged, labeled, marketed, advertised, distributed, and sold by Defendants, is defective in design and formulation and unreasonably dangerous because the Device was more dangerous than the ordinary customer would expect.

91.     Defendants knew that the design defects made the Device unreasonably dangerous to Plaintiff.

92.     It was unreasonable for a manufacturer with such knowledge to place the Device on the market without changing the design.

93.     At the time the Device left Defendants' possession and control, the Device contained a defective and unreasonably dangerous condition.

94.     At the time Plaintiff used the Device, the Device contained a defective and unreasonably dangerous condition.

95.     Plaintiff's healthcare providers implanted the Device as instructed via the Instructions for Use and in a foreseeable manner as normally intended, recommended, promoted, and marketed by Defendants.

96.     Plaintiff received and utilized the Device in a foreseeable manner as normally intended, recommended, promoted, and marketed by Defendants.

97.     At the time Defendants placed the Device into the stream of commerce, safer alternative designs existed that were attainable, available, and feasible commercially, technologically, and scientifically.

COMPLAINT

98.     These safer alternative designs would have prevented and/or mitigated the harm resulting in Plaintiff's Injuries and Damages without substantially impairing the reasonably anticipated or intended function of the Device.

99.     The defective and unreasonably dangerous condition of the Device was a substantial factor in causing Plaintiff's Injuries and Damages

100.    The Plaintiff's Injuries and Damages would not have happened or occurred had the Device not been defective and unreasonably dangerous.

101.    As a direct and proximate result of the defective and unreasonably dangerous condition of the Device, Plaintiff suffered Injuries and Damages.

102.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

103.    Plaintiff brings this count against Defendants AngioDynamics, Inc., and Navilyst Medical, Inc.

104.    Defendants owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, labeling, marketing, advertising, distributing, selling, and conducting post-market surveillance of the Device.

105.    Defendants breached their duty of care and were negligent in the design, manufacture, labeling, warning, instruction, training, selling, marketing, and distribution of the Device in one or more of the following respects:

   a.  The Device was inherently dangerous and defective, unfit and unsafe for its intended and reasonably foreseeable use and did not meet or perform to the user's intended expectations;

   b.  Failing to design the Device so as to avoid an unreasonable risk of harm to people in whom the Device was implanted, including Plaintiff;

   c.  Failing to manufacture the Device so as to avoid an unreasonable risk of harm to

people in whom the Device was implanted, including Plaintiff;

d. Failing to use reasonable care in the testing of the Device so as to avoid an unreasonable risk of harm to people in whom the Device was implanted, including Plaintiff;

e. Failing to use reasonable care in the inspecting of the Device so as to avoid an unreasonable risk of harm to people in whom the Device was implanted, including Plaintiff;

f. Failing to use reasonable care in training its employees and healthcare providers related to the use of the Device so as to avoid unreasonable risk of harm to people in whom the Device was implanted, including Plaintiff;

g. Failing to use reasonable care in instructing and/or warning healthcare providers, regulatory agencies, and the public of risks associated with the Device, so as to avoid unreasonable risk of harm to people in whom the Device was implanted, including Plaintiff;

h. Failing to use reasonable care in instructing and/or warning Plaintiff, healthcare providers, regulatory agencies, and the public of risks that the risk for severe complications increases over time as barium sulfate continually dissociates from the catheter surface;

i. Failing to use reasonable care in instructing and/or warning Plaintiff, healthcare providers, regulatory agencies, and the public of risks that the Device could cause serious injuries even when the Device is placed correctly;

j. Failing to use reasonable care in the marketing and promoting of the Device so as to avoid an unreasonable risk of harm to people in whom the Device was implanted, including Plaintiff;

k. Failing to use reasonable care in the labeling of the Device so as to avoid an unreasonable risk of harm to people in whom the Device was implanted, including Plaintiff;

l. Failing to properly and thoroughly test the Device before releasing the device to market, and/or failing to implement feasible safety improvements, so as to avoid unreasonable risk of harm to people in whom the Device was implanted, including Plaintiff;

m. Failing to properly and thoroughly analyze the data resulting from any pre-market testing of the Device, so as to avoid unreasonable risk of harm to people in whom the Device was implanted, including Plaintiff;

n. Failing to conduct sufficient post-market testing and surveillance of the Device, so

– 18 –

COMPLAINT

as to avoid unreasonable risk of harm to people in whom the Device was implanted, including Plaintiff;

o. Intentionally underreporting the number and nature of adverse events related to the Device to Plaintiff, Plaintiff's prescribing physicians, or the public at large;

p. Designing, manufacturing, marketing, advertising, distributing, and selling the Device to consumers, including Plaintiff and Plaintiff's healthcare providers, without an adequate warning of the significant and dangerous risks of the Device and without proper instructions to avoid the harm which could foreseeably occur as a result of using the Device;

q. Negligently continuing to manufacture, market, advertise, and distribute the Device after Defendants knew or reasonably should have known of its adverse effects; and

r. Failing to act as a reasonable manufacturer, distributor, seller under the same or similar circumstances would have acted.

106. As a direct and proximate result of Defendants' negligence, Plaintiff has suffered severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, economic loss and damages including, but not limited to medical expenses, lost income, and other damages. These damages have occurred in the past and will continue into the future.

## COUNT II: DESIGN DEFECT – NEGLIGENCE

107. Plaintiff restates the allegations above as if fully rewritten herein.

108. Defendants had a duty to exercise reasonable care, including in their design, testing, and formulation of The Device—including the Device surgically implanted in Plaintiff—to ensure that they did not create unreasonable risks of harm to others.

109. At all relevant times, Defendants failed to exercise reasonable care and breached their duties by, among other things:

a. Designing and distributing the Device, which Defendants knew or should have known that the likelihood and severity of potential harm from the Device exceeded the burden of taking safety measures to reduce or avoid harm;

b. Designing and distributing the Device, which Defendants knew or should have known that the likelihood and severity of potential harm from the Device exceeded the potential harm from other venous access devices available for the same purpose;

c. Otherwise failing to exercise reasonable and prudent care in the design, research, manufacture, and development of the Device so as to avoid the risk of serious harm associated with their use;

d. Failing to exercise reasonable care in the inspection of the product and to locate visible or hidden defects in the product;

e. Failing to perform reasonable and adequate pre- and post-market evaluation and testing of the Device to determine whether or not the products were safe for their intended use, when such evaluation and testing would have revealed the propensity of the Device to cause injuries similar to those that Plaintiff suffered; and

f. Failing to implement feasible safety improvements.

110. Defendants knew or should have known of the Device's design defects when used in a reasonably foreseeable manner.

111. As designers, developers, manufacturers, inspectors, advertisers, distributors, and suppliers of the Device, Defendants had superior knowledge of the product than did Plaintiff and Plaintiff's healthcare providers.

112. At the time of the design, manufacture, advertising, marketing, distribution, and sale of the Device, Defendants knew or should have known that the Device was designed in a manner presenting an unreasonable risk of: fracture, migration, and/or perforation; insufficient structural integrity to withstand normal placement within the human body; insufficient structural integrity to withstand repeated, long-term use; and death.

113. These design defects were not known or recognizable to Plaintiff or Plaintiffs healthcare providers.

114. Defendants knew or should have known that the users of the Device, including

COMPLAINT

Plaintiff and Plaintiff's healthcare providers, would not realize or discover on their own the design defects and dangers presented by the Device.

115. At the time of the design, manufacture, advertising, marketing, distribution, and sale of the Device, Defendants were also aware that the Device:

    a. Would be used without inspection for defects;

    b. Had previously caused serious bodily injury to users;

    c. Had no established efficacy; and

    d. Would be implanted in patients where the risks outweighed any benefit or utility of the Device.

116. Defendants' negligent design of the Device was a substantial factor in causing Plaintiff's Injuries and Damages.

117. Plaintiff's Injuries and Damages would not have happened or occurred had Defendants not been negligent in designing the Device.

118. As a direct and proximate result of Defendants' negligent design, Plaintiff has suffered severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, economic loss and damages including, but not limited to medical expenses, lost income, and other damages. These damages have occurred in the past and will continue into the future.

### COUNT III: FAILURE TO WARN/INSTRUCT – STRICT LIABILITY

119. Plaintiff restates the allegations above as if fully rewritten herein.

120. Plaintiff restates the allegations in Count IV as if fully rewritten herein.

121. At all relevant times, Defendants developed, designed, tested, manufactured, packaged, labeled, marketed, advertised, distributed, sold, and otherwise placed The Device

COMPLAINT

(including the Device surgically implanted in Plaintiff) into the stream of commerce for use by consumers, such as Plaintiff, in the United States (including commerce in the State of Arizona and New Jersey).

122.    Plaintiff was a foreseeable user of the Device.

123.    The Device was expected to and did reach Defendants' intended consumers, handlers, and persons coming into contact with the product without substantial change in the condition in which it was developed, designed, tested, manufactured, packaged, labeled, marketed, advertised, distributed, and sold by Defendants.

124.    At all times relevant, the Device contained a defective and unreasonably dangerous condition because it was defective in warnings and/or instructions and was dangerous for use by the public in general and Plaintiff in particular.

125.    These informational defects include, but are not limited to, failing to warn (or inadequately warning) about the risk of catheter fracture, infection, and thrombosis from the use of barium sulfate in the catheter, and the limited life expectancy of the Device.

126.    These informational defects existed even if Defendants exercised reasonable care.

127.    The Device, as developed, designed, tested, manufactured, packaged, labeled, marketed, advertised, distributed, and sold by Defendants, was defective in warnings and/or instructions and unreasonably dangerous because the foreseeable risks exceeded the alleged benefits associated with the use of The Device.

128.    The Device, as developed, designed, tested, manufactured, packaged, labeled, marketed, advertised, distributed, and sold by Defendants, was defective in warnings and/or instructions and unreasonably dangerous because The Device are more dangerous than the

– 22 –

COMPLAINT

ordinary customer would expect.

129. Defendants knew that the warnings and/or instructions defects made The Device unreasonably dangerous to Plaintiff.

130. At the time the Device left Defendants' possession and control, The Device contained a defective and unreasonably dangerous condition.

131. At the time Plaintiff used the Device, the Device contained a defective and unreasonably dangerous condition.

132. Physicians implanted the Device as instructed via the Instructions for Use and in a foreseeable manner as normally intended, recommended, promoted, and marketed by Defendants.

133. Plaintiff received and utilized the Device in a foreseeable manner as normally intended, recommended, promoted, and marketed by Defendants.

134. At the time Defendants placed their defective and unreasonably dangerous The Device into the stream of commerce, there were alternative warnings and/or instructions that were attainable, available, and feasible commercially, technologically, and scientifically.

135. These alternative warnings and/or instructions would have prevented and/or mitigated the harm resulting in Plaintiff's Injuries and Damages without substantially impairing the reasonably anticipated or intended function of the Device.

136. Had Plaintiff received proper or adequate warnings and/or instructions as to the risks of the Device, Plaintiff would have heeded the warnings and/or instructions.

137. Had Plaintiff received proper or adequate warnings and/or instructions as to the risks of the Device, Plaintiff's healthcare providers would have heeded the warnings and/or instructions.

COMPLAINT

138.    Had Plaintiff's healthcare providers received proper or adequate warnings and/or instructions as to the risks of the Device, Plaintiff's healthcare providers would not have prescribed the Device nor implanted it in Plaintiff and/or chosen a different path of treatment.

139.    The defective and unreasonably dangerous condition of the Device was a substantial factor in causing Plaintiff's Injuries and Damages.

140.    The Plaintiff's Injuries and Damages would not have happened or occurred had The Device not been defective and unreasonably dangerous.

141.    As a direct and proximate result of the defective and unreasonably dangerous condition of The Device, Plaintiff suffered Injuries and Damages.

### COUNT IV: FAILURE TO WARN/INSTRUCT – NEGLIGENCE

142.    Plaintiff restates the allegations above as if fully rewritten herein.

143.    Defendants had a duty to exercise reasonable care, including in their warnings, instructions, and labeling of the Device to ensure that the devices did not create unreasonable risks of harm to others.

144.    Defendants' duty to warn existed before, during, and after the time of sale of the Device.

145.    At all times relevant hereto, Defendants failed to exercise reasonable care and breached their duties by, among other things:

a. Designing and distributing the Device, which Defendants knew or should have known that the likelihood and severity of potential harm from the Device exceeded the burden of providing adequate warnings and/or instructions to reduce or avoid harm;

b. Designing and distributing the Device, which Defendants knew or should have known that the likelihood and severity of potential harm from the Device exceeded the potential harm from other venous access devices available for the same purpose;

COMPLAINT

c. Failing to provide an adequate warning of the significant and dangerous risks of the Device;

d. Failing to provide adequate instructions for safe use to avoid the harms that could foreseeably occur as a result of using the Device;

e. Otherwise failing to exercise reasonable and prudent care in the labeling of the Device;

f. Failing to exercise reasonable care when advertising and promoting the Device; and

g. Failing to perform reasonable pre- and post-market testing of the Device to determine whether or not the warnings and/or instructions were adequate for reasonably safe use.

146. Defendants knew or should have known of the Device' informational defects when used in a reasonably foreseeable manner.

147. As designers, developers, manufacturers, inspectors, advertisers, distributors, and suppliers of The Device, Defendants had superior knowledge of the Device than did Plaintiff and Plaintiff's healthcare providers.

148. At the time of the design, manufacture, advertising, marketing, distribution, and sale of The Device, Defendants knew or should have known the Device was labeled in a manner with inadequate warnings and/or instructions regarding the risk of:

a. Fracture, migration, and/or perforation;

b. Infection;

c. Thrombosis;

d. Insufficient structural integrity to withstand normal placement within the human body;

e. Insufficient structural integrity to withstand repeated, long-term use; and

f. Death.

COMPLAINT

149. These informational defects were not known or recognizable to Plaintiff or their healthcare providers.

150. Defendants knew or should have known that the users of the Device, including Plaintiff and Plaintiff's healthcare providers, would not realize or discover on their own the informational defects and dangers presented by the Device.

151. Had Plaintiff's healthcare providers received proper or adequate warnings and/or instructions as to the risks of the Device, Plaintiff's healthcare providers would not have prescribed the Device nor implanted it in Plaintiff and/or chosen a different path of treatment.

152. Defendants' negligent warnings and/or instructions regarding the Device was a substantial factor in causing Plaintiff's Injuries and Damages.

153. The Plaintiff's Injuries and Damages would not have happened or occurred had Defendants not been negligent in warning and/or instructing regarding the Device.

154. As a direct and proximate result of Defendants' negligent warnings and/or instructions regarding the Device, Plaintiff suffered Injuries and Damages.

### COUNT V: MANUFACTURING DEFECT – STRICT LIABILITY

155. Plaintiff restates the allegations above as if fully rewritten herein.

156. Plaintiff restates the allegations in Count VI as if fully rewritten herein.

157. At all relevant times, Defendants developed, designed, tested, manufactured, packaged, labeled, marketed, advertised, distributed, sold, and otherwise placed The Device (including the Device surgically implanted in Plaintiff) into the stream of commerce for use by consumers, such as Plaintiff, in the United States (including commerce in the State of Arizona and New Jersey).

– 26 –

COMPLAINT

158.    Plaintiff was a foreseeable user of the Device.

159.    The Device was expected to and did reach Defendants' intended consumers, handlers, and persons coming into contact with the product without substantial change in the condition in which it was developed, designed, tested, manufactured, packaged, labeled, marketed, advertised, distributed, and sold by Defendants.

160.    At all times relevant, the Device contained a defective and unreasonably dangerous condition because it was defective in manufacturing and was dangerous for use by the public in general and Plaintiff in particular.

161.    These manufacturing defects include but are not limited to deviating from Defendants' design or specifications for (1) the concentration of barium sulfate in the catheter and (2) the homogeneous barium sulfate distribution throughout the catheter.

162.    These manufacturing defects existed even if Defendants exercised reasonable care.

163.    The Device, as developed, designed, tested, manufactured, packaged, labeled, marketed, advertised, distributed, and sold by Defendants, was defective in manufacturing and unreasonably dangerous because The Device contained a condition that Defendants did not intend.

164.    The Device, as developed, designed, tested, manufactured, packaged, labeled, marketed, advertised, distributed, and sold by Defendants, was defective in manufacturing and unreasonably dangerous because the Device was more dangerous than the ordinary customer would expect.

165.    Defendants knew that the manufacturing defects made the Device unreasonably dangerous to Plaintiff.

166.    At the time the Device left Defendants' possession and control, the Device

– 27 –

COMPLAINT

contained a defective and unreasonably dangerous condition.

167.    At the time Plaintiff used the Device, the Device contained a defective and unreasonably dangerous condition.

168.    Physicians implanted the Device as instructed via the Instructions for Use and in a foreseeable manner as normally intended, recommended, promoted, and marketed by Defendants.

169.    Plaintiff received and utilized the Device in a foreseeable manner as normally intended, recommended, promoted, and marketed by Defendants.

170.    At the time Defendants placed their defective and unreasonably dangerous the Device into the stream of commerce, there were safer alternative designs that were attainable, available, and feasible commercially, technologically, and scientifically.

171.    These safer alternative designs would have prevented and/or mitigated the harm resulting in Plaintiff's Injuries and Damages without substantially impairing the reasonably anticipated or intended function of the Device.

172.    The defective and unreasonably dangerous condition of the Device was a substantial factor in causing Plaintiff's Injuries and Damages.

173.    The Plaintiff's Injuries and Damages would not have happened or occurred had The Device not been defective and unreasonably dangerous.

174.    As a direct and proximate result of the defective and unreasonably dangerous condition of The Device, Plaintiff suffered Injuries and Damages.

## COUNT VI: MANUFACTURING DEFECT – NEGLIGENCE

175.    Plaintiff restates the allegations above as if fully rewritten herein.

COMPLAINT

176.    Defendants had a duty to exercise reasonable care, including in their manufacture of The Device—including the Device surgically implanted in Plaintiff—to ensure that they did not create unreasonable risks of harm to others.

177.    At all times relevant hereto, Defendants failed to exercise reasonable care and breached their duties by, among other things:

a.    Failing to adopt manufacturing processes that would reduce the foreseeable risk of product failure;

b.    Failing to implement adequate procedural safeguards to ensure that The Device did not differ from Defendants' design or specifications or from other typical units from the same production line;

c.    Failing to establish an adequate quality-assurance program used in the manufacturing of The Device;

d.    Failing to implement adequate procedural safeguards, including but not limited to failing to perform quality-control testing, to ensure that The Device met Defendants' specifications for barium-sulfate concentration; and

e.    Failing to implement adequate procedural safeguards, including but not limited to failing to perform quality-control testing, to ensure that The Device met Defendants' specifications for the homogeneity of barium sulfate throughout the surface of the catheters.

178.    Defendants knew or should have known of The Device' manufacturing defects.

179.    As designers, developers, manufacturers, inspectors, advertisers, distributors, and suppliers of The Device, Defendants had superior knowledge of The Device than did Plaintiff and Plaintiff's healthcare providers.

180.    At the time of the design, manufacture, advertising, marketing, distribution, and sale of the Device, Defendants knew or should have known the Device was manufactured in a manner presenting an unreasonable risk of:

a.    Fracture, migration, and/or perforation;

– 29 –

COMPLAINT

b.  Infection;

c.  Thrombosis;

d.  Insufficient structural integrity to withstand normal placement within the human body;

e.  Insufficient structural integrity to withstand repeated, long-term use; and

f.  Death.

181.    These manufacturing defects were not known or recognizable to Plaintiff or their healthcare providers.

182.    Defendants knew or should have known that the users of the Device, including Plaintiff and Plaintiff healthcare providers, would not realize or discover on their own the manufacturing defects and dangers presented by the Device.

183.    At the time of the design, manufacture, advertising, marketing, distribution, and sale of the Device, Defendants were also aware that the Device would be used without inspection for these defects.

184.    Defendants' negligent manufacturing of the Device was a substantial factor in causing Plaintiff's Injuries and Damages.

185.    The Plaintiff's Injuries and Damages would not have happened or occurred had Defendants not been negligent in manufacturing The Device.

186.    As a direct and proximate result of Defendants' negligent manufacturing of The Device, Plaintiff suffered Injuries and Damages.

## COUNT VII: BREACH OF EXPRESS WARRANTY

187.    Plaintiff restates the allegations above as if fully rewritten herein.

188.    Plaintiff, through their medical providers, purchased the Device from Defendants.

COMPLAINT

189.    At all relevant times, Defendants were merchants of goods of the kind including medical devices and implanted port catheters (i.e., the Device).

190.    At the time and place of sale, distribution, and supply of the Device to Plaintiff, as well as other consumers and the medical community, Defendants expressly represented and warranted that the Device was, among other things:

    a.    Safe and effective for their intended use;

    b.    Well-tolerated, efficacious, and fit for their intended purpose;

    c.    Of merchantable quality;

    d.    Did not produce any unwarned-of dangerous side effects; and

    e.    Adequately tested.

191.    Defendants expressly represented and warranted that, among other things:

    a.    The Device catheters was less likely to fracture than other venous access devices;

    b.    The risk of IPC fracture is limited to physician or patient error;

    c.    The Device was less likely to become infected than external catheters;

    d.    The risk of IPC infection is limited to physician or patient error;

    e.    The Device was biocompatible;

    f.    The Device was durable;

    g.    The Device was safe and effective for long-term use;

    h.    The Device could withstand repeated venous access;

    i.    The Device was cosmetically appealing; and

    j.    Defendants conduct adequate post-market surveillance to ensure patient safety.

192.    These warranties came in one or more of the following forms:

    a.    publicly made written and verbal assurances of safety;

b.  press releases, media dissemination, or uniform promotional information intended to create demand for The Device, but which contained misrepresentations and failed to warn of the risks of using the product;

c.  verbal assurances made by Defendants' consumer relations personnel about the safety of The Device, which also downplayed the risks associated with the product; and

d.  false, misleading, and inadequate written information and packaging supplied by Defendants.

193. When Defendants made these express warranties, they knew the intended purposes of The Device and warranted The Device to be in all respects safe and proper for such purposes.

194. Defendants drafted the documents and/or made statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties.

195. At the time of Plaintiff's purchase from Defendants, the Device was not in a merchantable condition and was not fit for its intended purpose.

196. Defendants breached their expressed warranties insofar as the Device, among other things:

a.  Did not conform to Defendants' promises, descriptions, or affirmations;

b.  Was not adequately packaged, labeled, promoted, and/or fit for the ordinary purpose for which it was intended;

c.  Was designed in such a manner so as to be prone to an unreasonably high incidence of infection, thrombosis, fracture, migration, and/or perforation of vessels and organs;

d.  Was manufactured in such a manner that the catheter was inadequately, improperly, and inappropriately constituted, causing it to degrade; and

e.  Carried a risk of use outweighed any benefit.

197. Defendants' breach of express warranty was a substantial factor in causing Plaintiff's Injuries and Damages.

198.    The Plaintiff's Injuries and Damages would not have happened or occurred had Defendants not breached their express warranties.

199.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiff suffered Injuries and Damages.

## COUNT VIII: BREACH OF IMPLIED WARRANTY

200.    Plaintiff restates the allegations above as if fully rewritten herein.

201.    Plaintiff, through their medical providers, purchased The Device from Defendants.

202.    At all relevant times, Defendants were merchants of goods of the kind including medical devices and implanted port catheters (i.e., the Device).

203.    At the time and place of sale, distribution, and supply of the Device to Plaintiff (and to other consumers and the medical community), Defendants impliedly warranted that the Device were, among other things:

a.    Fit for a particular purpose;

b.    Safe and effective for their intended use; and

c.    Of merchantable quality.

204.    Defendants knew or had reason to know that Plaintiff would rely upon Defendants' judgment and skill in providing the Device for their intended use.

205.    Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether the Device was fit for a particular purpose, safe and effective for their intended use, and of merchantable quality.

206.    Indeed, Defendants admit that their "customers and patients … depend on the quality and safety of [Defendants'] products," including the Device.

COMPLAINT

207.   At the time of Plaintiff's purchase from Defendants, the Device was not of merchantable quality, nor safe and effective for their intended use, nor fit for a particular purpose.

208.   Defendants breached their implied warranties by, among other things:

a.   Failing to provide adequate instruction that a manufacturer exercising reasonable care would have provided concerning the likelihood that the Device would cause harm;

b.   Manufacturing and/or selling the Device when those devices did not conform to representations made by Defendants when they left Defendants' control;

c.   Manufacturing and/or selling the Device that were more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner;

d.   Manufacturing and/or selling the Device that carried foreseeable risks associated with its design or formulation which exceeded the benefits associated with that design; and

e.   Manufacturing and/or selling the Device when they deviated in a material way from the design specifications, formulas, or performance standards, or from otherwise identical units manufactured to the same design specifications, formulas, or performance standards.

209.   Plaintiff could not have discovered that Defendants breached their implied warranties or the danger in using the Device.

210.   Defendants' breach of implied warranties was a substantial factor in causing Plaintiff's Injuries and Damages.

211.   Plaintiff's Injuries and Damages would not have happened or occurred had Defendants not breached their implied warranties.

212.   As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff suffered Injuries and Damages.

## COUNT IX: NEGLIGENT MISREPRESENTATION

213.    Plaintiff restates the allegations above as if fully rewritten herein.

214.    Defendants had a duty to exercise reasonable care, including in their dissemination of information concerning The Device, to ensure that they did not create unreasonable risks of harm to others.

215.    Defendants had a duty to tell Plaintiff, Plaintiff's healthcare providers, and the public the truth about the efficacy, risks, and harms associated with The Device.

216.    At all times relevant hereto, Defendants failed to exercise reasonable care and breached their duties by negligently misrepresenting to Plaintiff, Plaintiff's healthcare providers, and the public that, among other things:

    a.    The Device catheter was less likely to fracture than other venous access devices;

    b.    The risk of IPC fracture is limited to physician or patient error;

    c.    The Device was less likely to become infected than external catheters;

    d.    The risk of IPC infection is limited to physician or patient error;

    e.    The Device was biocompatible;

    f.    The Device was durable;

    g.    The Device was safe and effective for long-term use;

    h.    The Device could withstand repeated venous access;

    i.    The Device was cosmetically appealing; and

    j.    Defendants conduct adequate post-market surveillance to ensure patient safety.

217.    These representations were untrue, as detailed further above.

218.    Defendants knew or should have known that these representations were false and/or provided Plaintiff with incorrect information.

– 35 –

COMPLAINT

219. Defendants knew or should have known that these representations were false and/or provided Plaintiff's healthcare providers with incorrect information.

220. Defendants disseminated information concerning the Device to healthcare professionals and consumers, including to Plaintiffs and Plaintiff's healthcare providers, directly and indirectly, orally and in writing, including but not limited to through sales representatives, reports, press releases, advertising campaigns, print advertisements, commercial media, marketing materials, labeling materials, instructions for use, and otherwise.

221. Defendants intended that Plaintiff and Plaintiff's healthcare providers would rely upon Defendants' misrepresentations in their decisions concerning whether to prescribe and use The Device.

222. Defendants, as medical device designers, manufacturers, sellers, promoters and/or distributors, knew or should reasonably have known that Plaintiff and Plaintiff's healthcare providers, in weighing the potential benefits and potential risks of prescribing or using The Device, would rely upon information disseminated and marketed by Defendants to them regarding The Device.

223. Plaintiff and Plaintiff's healthcare providers did so reasonably and justifiably rely upon Defendants' negligent misrepresentations in using The Device.

224. Defendants' misrepresentations about the Device were material to Plaintiff and Plaintiff's healthcare providers in that those representations influenced Plaintiff and Plaintiff's healthcare providers' decisions to purchase and use the Device.

225. Defendants failed to exercise reasonable care to ensure that the information they disseminated to Plaintiff and Plaintiff's healthcare providers concerning the properties and effects

of the Device was accurate, complete, and not misleading and, as a result, disseminated information to health care professionals and consumers that was negligently and materially inaccurate, misleading, false, and unreasonably dangerous to consumers such as Plaintiff.

226. Defendants, as medical device designers, manufacturers, sellers, promoters, and/or distributors, also knew or reasonably should have known that patients receiving The Device as recommended by healthcare professionals in reliance upon information disseminated by Defendants as the manufacturer/distributor of the Device would be placed in peril of developing serious, life-threatening, and life-long injuries including but not limited to fracture, migration, perforation, infection, and thrombosis, if the information disseminated and relied upon was materially inaccurate, misleading, or otherwise false.

227. Defendants had a duty to promptly correct material misrepresentations and/or incorrect information that they knew Plaintiff, Plaintiff's healthcare providers, and others were relying upon in making healthcare decisions.

228. Defendants failed in each of the foregoing duties by misrepresenting to Plaintiff and the medical community the safety and efficacy of the Device and failing to correct known misrepresentations and/or incorrect information.

229. At all times relevant hereto, Plaintiff and Plaintiff's healthcare providers were unaware that Defendants' representations were false and were unaware of Defendants' omissions.

230. Defendants' negligent misrepresentations were a substantial factor in causing Plaintiff's Injuries and Damages.

231. Plaintiff's Injuries and Damages would not have happened or occurred had Defendants not made negligent misrepresentations.

232.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff suffered Injuries and Damages.

### COUNT X: FRAUDULENT MISREPRESENTATION

233.    Plaintiff restates the allegations above as if fully rewritten herein.

234.    At all times relevant hereto, Defendants intentionally and/or with a reckless disregard for the truth misrepresented The Device to Plaintiff, Plaintiff's healthcare providers, and the public, as detailed further above.

235.    These representations were untrue, as detailed further above.

236.    Defendants knew these representations were false and they willfully, wantonly, and recklessly disregarded the truth.

237.    Defendants disseminated information concerning The Device to healthcare professionals and consumers, including to Plaintiff and Plaintiff's healthcare providers, directly and indirectly, orally and in writing, including but not limited to through sales representatives, reports, press releases, advertising campaigns, print advertisements, commercial media, marketing materials, labeling materials, instructions for use, and otherwise.

238.    Defendants intended that Plaintiff and Plaintiff's healthcare providers would rely upon Defendants' misrepresentations in their decisions concerning whether to prescribe and use The Device.

239.    Defendants, as medical device designers, manufacturers, sellers, promoters and/or distributors, knew or should reasonably have known that Plaintiff and Plaintiff's healthcare providers, in weighing the potential benefits and potential risks of prescribing or using The Device,

would rely upon information disseminated and marketed by Defendants to them regarding The Device.

240.    Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's healthcare providers; to gain the confidence of the public and the medical community; to falsely assure the public and the medical community of the quality of The Device and their fitness for use; and to induce the public and the medical community, including Plaintiff and Plaintiff's healthcare providers, to request, recommend, prescribe, implant, purchase, and continue to use The Device, all in reliance on Defendants' misrepresentations.

241.    Plaintiff and Plaintiff's healthcare providers reasonably and justifiably relied upon Defendants' fraudulent misrepresentations in using The Device.

242.    Defendants' misrepresentations about the Device were material to Plaintiff and Plaintiff's healthcare providers in that those representations influenced Plaintiff's and Plaintiff's healthcare providers' decisions to purchase and use the Device.

243.    At all times relevant hereto, Plaintiff and Plaintiff's healthcare providers were unaware of the falsity of Defendants' representations and reasonably believed them to be true.

244.    Defendants' fraudulent misrepresentations were a substantial factor in causing Plaintiff's Injuries and Damages.

245.    The Plaintiff's Injuries and Damages would not have happened or occurred had Defendants not made fraudulent misrepresentations.

246.    As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff suffered Injuries and Damages.

– 39 –

COMPLAINT

## COUNT XI: FRAUDULENT CONCEALMENT

247. Plaintiff restates the allegations above as if fully rewritten herein.

248. At all times relevant hereto, Defendants intentionally and fraudulently concealed material facts about The Device from Plaintiff, Plaintiff's healthcare providers, and the public, including but not limited to the fact that:

a. The Device was unsafe and not fit when used for their intended purpose or used in a reasonably foreseeable manner;

b. The Device posed dangerous health risks in excess of those associated with the use of other similar IPCs;

c. Additional side effects related to implantation and use of the Device were not accurately and completely reflected in the warnings associated with The Device; and

d. The Device was not adequately tested to withstand normal placement within the human body.

249. Defendants had a duty to disclose to Plaintiff, Plaintiff's healthcare providers, and the public the truth about The Device arising out of, *inter alia*:

a. Defendants' superior knowledge of and/or sole access to superior information regarding intrinsic qualities of The Device that are not readily ascertainable by customers, such as Plaintiff;

b. Defendants' partial disclosures;

c. The nature of the fact itself;

d. Defendants' special relationship with Plaintiff;

e. The course of the parties' dealings; and

f. The particular circumstances of the case.

250. Defendants' concealment of information regarding The Device was willful, wanton, and/or reckless.

– 40 –

COMPLAINT

251.    Defendants intended that Plaintiff and Plaintiff's healthcare providers would rely upon Defendants' misrepresentations and omissions in their decisions concerning whether to prescribe and use The Device.

252.    Plaintiff and Plaintiff's healthcare providers reasonably and justifiably relied upon Defendants' omissions in using The Device.

253.    Defendants' omissions about the Device were material to Plaintiff and Plaintiff's healthcare providers in that those representations influenced Plaintiff and Plaintiff's healthcare providers decisions to purchase and use the Device.

254.    At all times relevant hereto, Plaintiff and Plaintiff's healthcare providers were unaware of these, and other facts omitted and concealed by Defendants.

255.    Defendants knew that Plaintiff could not determine the truth of the foregoing information.

256.    Defendants' fraudulent omissions were a substantial factor in causing Plaintiff's Injuries and Damages.

257.    Plaintiff's Injuries and Damages would not have happened or occurred had Defendants not made fraudulent omissions.

258.    As a direct and proximate result of Defendants' fraudulent omissions, Plaintiff suffered Injuries and Damages.

## COUNT XII: VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT

259.    Plaintiff restates the allegations above as if fully rewritten herein.

260.    Defendants have engaged in false, misleading, and deceptive acts and practices in the course of trade and commerce as defined and forbidden by the Texas Deceptive Trade

Practices—Consumer Protection Act, Tex. Bus. & Com. Code Ann. §§ 17.46(a) and 17.50(a), which are actionable by the Plaintiff.

261. Defendants represented that the goods (the Device) had sponsorship, approval, characteristics, ingredients, uses, benefits, and qualities which they did not have, contrary to Tex. Bus. & Com. Code Ann. § 17.46(b)(5).

262. Defendants failed to disclose information concerning the Device which was known at the time of the transaction with the intent to induce the Plaintiff into a transaction into which the Plaintiff would not have entered had the information been disclosed, in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(24).

263. At all times relevant, Defendants engaged in conduct that created a likelihood of confusion or misunderstanding regarding the source, sponsorship, approval, or certification of the Device, contrary to Tex. Bus. & Com. Code Ann. § 17.46(b)(9).

264. Plaintiff and her prescribing healthcare providers relied on the false, misleading, and deceptive acts and practices of Defendants in deciding to use the Device for Teresa Sandoval, which reliance was specifically intended and anticipated by Defendants.

265. As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff and the Estate of Teresa Sandoval suffered actual damages including but not limited to medical expenses, pain and suffering, mental anguish, and ultimately, the death of Teresa Sandoval.

266. As a result of the foregoing deceptive practices, Plaintiff seeks actual damages, treble damages for the knowing and intentional commission of said acts, attorneys' fees, court costs, and interest, as provided by Tex. Bus. & Com. Code Ann. § 17.50(b).

COMPLAINT

267.    Plaintiff further seeks such other and further legal and equitable relief to which she may be justly entitled under the DTPA.

268.    Plaintiff prays that the Court grant all damages and relief cited under this cause of action, including actual damages, treble damages as warranted, attorneys' fees, court costs, and all such other and further relief to which she may show herself justly entitled.

## COUNT XIII: UNJUST ENRICHMENT

269.    Plaintiffs restate the allegations above as if fully rewritten herein.

270.    Plaintiffs allege this claim for unjust enrichment in the alternative.

271.    Through their false and misleading statements, Defendants induced Plaintiffs and Plaintiffs' healthcare providers to purchase the Device.

272.    The sale of the Device by Defendants to Plaintiffs, through the intermediary healthcare providers, conferred a benefit on Defendants, including but not limited to profits from the sales.

273.    Defendants knowingly received, accepted, and retained a benefit to which they were not entitled when they sold the Device to Plaintiffs.

274.    It would be inequitable, unconscionable, and unjust for Defendants to retain the benefit of the sales of the Device to Plaintiffs while Plaintiffs suffered Injuries and Damages.

275.    Plaintiffs are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Defendants and/or disgorgement of Defendants' profits from the Device.

## COUNT XIV: PUNITIVE DAMAGES

276.    Plaintiff restates the allegations above as if fully rewritten herein.

COMPLAINT

277. Defendants have acted willfully, wantonly, recklessly and with evil mind, evil motive, malice, conscious indifference, and deliberate disregard for the substantial risk of physical harm and/or death to consumers, such as Plaintiff, including but not limited to:

   a. By failing to disclose material facts regarding the dangers and serious safety concerns of The Device;

   b. By concealing and suppressing material facts regarding the dangers and serious health and/or safety concerns of The Device;

   c. By failing to disclose the truth and making false representations with the purpose of deceiving Plaintiff and lulling them into using and relying upon The Device; and

   d. By falsely representing the qualities and characteristics of The Device to the public and Plaintiff.

278. Defendants' conduct is grossly negligent and reprehensible, evidencing an evil motive, and was undertaken for pecuniary gain.

279. Such conduct justifies an award of punitive or exemplary damages in an amount sufficient to punish Defendants' conduct and deter like conduct by Defendants and other similarly situated persons and entities in the future.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all counts of Plaintiff's Complaint.

## PRAYER

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, individually, jointly and severally, on all causes of action of this Complaint and requests:

   a. Plaintiff be awarded full, fair, and complete recovery for all claims and causes of action relevant to this action;

   b. Compensatory damages to Plaintiff for past, present, and future damages, including, but not limited to, pain and suffering, mental anguish, disfigurement, impairment, medical expenses, lost wages, lost earning capacity, and loss of household services together with interest and costs as provided by law;

c.  Punitive or exemplary damages;

d.  Disgorgement of profits;

e.  Restitution;

f.  Statutory damages, where authorized;

g.  Any and all applicable statutory and civil penalties, as allowed by law;

h.  Costs and expenses of suit;

i.  Reasonable attorneys' fees, where authorized;

j.  Pre-judgment interest as allowed by law;

k.  Post-judgment interest at the highest applicable statutory or common-law rate from the date of judgment until satisfaction of judgment; and

l.  For such other and further relief as the court may deem just and proper.

Dated: October 30, 2024                    Respectfully submitted,

                                           **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                           */s/ Cameron R. Cano*
                                           Cameron Cano
                                           SBN: 214101314
                                           7718 Wood Hollow Drive, Suite 105
                                           Austin, TX 78731
                                           Phone: 512.337.8430
                                           Fax: 512.727.3432
                                           ccano@scott-scott.com
                                           *ATTORNEYS FOR PLAINTIFF*

COMPLAINT